IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2017 Session

## STATE OF TENNESSEE v. DEREDIOUS OTIS, BRASHARD GIBBS, and CARLOS KEY

**Appeal from the Criminal Court for Shelby County**
**Nos. 14-00025, 13-04715         James M. Lammey, Judge**

_____

### No. W2016-01261-CCA-R3-CD

_____

Defendants Deredious Otis and Carlos Key each were convicted of one count of first degree premeditated murder and two counts of attempted first degree murder, and Defendant Brashard Gibbs was convicted of one count of first degree premeditated murder, five counts of attempted first degree murder, and three counts of employing a firearm during the commission of a dangerous felony. Defendants Otis and Key each were sentenced to life for their first degree murder conviction and twenty-five years for each of their attempted first degree murder convictions, with all sentences to be served consecutively. Defendant Gibbs was sentenced to life for the first degree murder conviction, twenty-five years for each of the five counts of attempted first degree murder, and six years for each of the three counts of employing a firearm during the commission of a dangerous felony, with all sentences to be served consecutively. On appeal, all three Defendants argue that the evidence is insufficient to support the verdicts and that the trial court erred in consolidating the indictments; and Defendants Otis and Gibbs argue that the court erred in sentencing. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Lance R. Chism (on appeal) and Eric Scott Hall (at trial), Memphis, Tennessee, for the appellant, Deredious Otis.

Eric Mogy, Memphis, Tennessee, for the appellant, Brashard Gibbs.

Murray B. Wells (on appeal and at trial) and Arthur F. Horne, III (at trial), Memphis, Tennessee, for the appellant, Carlos Key.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Raymond Lepone and Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## <u>FACTS</u>

These crimes resulted from the burglary of the Memphis residence of "Money Machine D" by his cousin, Joseph Taylor; Stanley Hibbler; Cortaze Tisdel; and Randy Godwin and their stealing approximately $100,000 cash and 80 pounds of marijuana. As a result of subsequent extravagant purchases made by Mr. Godwin and Mr. Tisdel, "Money Machine D" apparently surmised that the men were responsible for the thefts and enlisted the Defendants to kill them. The first series of crimes, which resulted in Indictment No. 14-00025, occurred on August 28, 2013, at a carwash on Lamar Avenue in Memphis as Defendant Key circled the carwash in his burgundy-colored vehicle. His passengers were Defendant Otis, armed with two handguns with extended clips, and Defendant Gibbs, armed with a Chopper double-barreled machine gun, who sprayed the carwash with bullets. Struck and killed by the fusillade was Mr. Robbie Webb who was having his car washed and was not involved in the earlier burglary or theft which precipitated the shooting. Also at the carwash were Mr. Tisdel, who was shot in the buttocks, and Mr. Godwin and Mr. Hibbler, who were not injured. Although Mr. Tisdel initially denied to police officers that he had been at the carwash at the time of the shooting, he later admitted he had done so because he intended to take revenge on the Defendants himself.

The second incident involving the Defendants and resulting in Indictment No. 13-04715 occurred on September 21, 2013, when Mr. Godwin was driving on Interstate 240 with his cousin, Traci Lott, and her boyfriend, Edward Bryant. Mr. Godwin saw a white Dodge Dart pull in behind his vehicle. Defendant Key was driving while Defendants Otis and Gibbs leaned out of the car and opened fire on Mr. Godwin's vehicle, riddling it with bullet holes. Mr. Godwin exited the interstate and called 911. At this point, he decided to cooperate with the police regarding the carwash shooting because he believed the Defendants would continue to try and kill him.

We now will review the evidence in this matter.

- 2 -

Lowell Love testified that, at the time of the carwash shooting, he was washing a blue Corvette, as the owner stood behind the stall being used by Mr. Love. Several others, whom he did not know, were standing nearby. When he heard gunfire, Mr. Love ran into a nearby store, where he stayed for ten minutes. When he returned from the store, the deceased victim's body was on the ground. During the shooting, Mr. Love was wounded in the arm.

Stanley Hibbler testified that he was at the carwash, having his Corvette washed, as the shots began. The Defendants drove by the carwash in a burgundy-colored vehicle, firing shots. Mr. Hibbler dropped behind one of the walls of the carwash until the shooting stopped. Initially, he did not talk with officers about the shooting because he intended to kill the Defendants himself.

Mr. Hibbler said he knew the Defendants from the neighborhood and that they had been hired to kill him for his role in the theft of money and drugs from "Little D's" house. He further said that the deceased victim, who was his cousin, had not been involved in the theft.

Cortaze Tisdel testified that he was at the carwash with Mr. Hibbler, Mr. Godwin, and Mr. Taylor. The Defendants circled the carwash before opening fire, wounding Mr. Tisdel and killing Mr. Webb. The witness said that Defendant Gibbs had fired with a Chopper double-barreled machine gun, while Defendant Otis had used two handguns with long clips.

Mr. Tisdel said he lied to the police about whom the shooters were because he planned to seek revenge. After a second attempt was made on his life, however, he gave a statement identifying the Defendants. He told the officers that Defendants Gibbs and Otis were the shooters, with Gibbs wounding him. Mr. Tisdel said that the Defendants had been looking for him for his part in the theft of 80 pounds of marijuana and approximately $100,000 from the house of "Money Machine D" a month earlier, along with Mr. Hibbler, Mr. Taylor, and Mr. Godwin. From the proceeds of the robbery, Mr. Tisdel received about $30,000, which he used to purchase clothes, drugs, and an Infinity automobile.

Keith Howell, Jr., testified that he was a friend of the Defendants and that he told them the night of the carwash shooting that their names had come up regarding it. Regarding their involvement in the shooting, the Defendants told Mr. Howell, "If it was, they won't [have] enough [evidence] to convict us with it." Defendants Gibbs and Otis also said, "If we do get caught up in this, they won't have enough evidence." Mr. Howell took this response to mean that, while the Defendants had been involved, the police would not be able to prove it. Mr. Howell said that "Little D" was a member of the

Young Mob gang and that the shooting was in retaliation for the burglary of his house when marijuana and money were taken.

Randy Godwin said that, at the time of the carwash shooting, he was waiting for his vehicle to be washed and was called to the office. He saw the Defendants' car make a right turn by the carwash and heard gunshots as he was returning to his vehicle. He saw that Defendant Key was driving the car, as Defendants Otis and Gibbs were shooting from it. Several days later, he happened to see Defendants Otis and Gibbs at a store where they told him that they would kill him if he talked with the police about the shooting.

Mr. Godwin testified that, a few days after his store encounter with Defendants Otis and Gibbs, he was driving on Interstate 240, with Ms. Lott and Mr. Bryant as passengers. A white Dodge Dart came up behind them and shot out the rear window of his vehicle. Mr. Godwin looked back and saw that Defendant Key was driving the shooters' vehicle, as Defendants Otis and Gibbs were leaning out of it. He pulled off the expressway and called 911.

Edward Bryant testified that on September 21, 2013, he and his girlfriend, Traci Lott, were riding in Mr. Godwin's truck on Interstate 240 when the occupants of a white Dodge car began firing shots at the truck. Mr. Bryant identified Defendant Gibbs, who was hanging out the back window, as the shooter and said he had seen Defendant Key driving the white car earlier that day. Ms. Lott, who was sitting in the backseat, was injured by broken glass from the back window.

Traci Lott testified that when the shooting on the interstate began, she was in a state of shock, and Mr. Godwin and Mr. Bryant told her to "get down." Regarding her injuries, she said, "I had glass, and I got scraped with one of the bullets." She did not see the shooter.

Officer Ned Aufdenkamp of the Memphis Police Department testified that on September 21, 2013, he responded to a shooting call involving a vehicle in the area of Interstate 240 and Lamar Avenue. He located the vehicle and the victims near St. Francis Hospital. The vehicle had "several windows shot out, damage consistent to a vehicle being shot at." The female victim had minor injuries from flying debris.

Special Agent Forensic Scientist Cervinia Braswell of the Tennessee Bureau of Investigation testified that four bullet jackets and one bullet recovered from Mr. Godwin's vehicle were consistent with having been fired from a Glock type pistol. She also determined that nine .40 caliber cartridge cases and six nine-millimeter Luger cartridge cases collected from the carwash were consistent with being fired from a Glock

pistol. Three additional cartridge cases were fired from an AK47 type rifle, also known as a "Chopper." The bullet recovered from the deceased victim's body was a .40 caliber bullet, consistent with having been fired from a Glock pistol.

Dr. Erica Curry testified that she performed the autopsy on Mr. Webb and determined that he bled out as the result of a bullet hitting a major artery.

The Defendants did not testify or present any evidence.

## ANALYSIS

We will review the issues raised by the Defendants on appeal.

### I. Sufficiency of the Evidence

To sustain the first degree murder convictions, the State had to prove beyond a reasonable doubt that the Defendants committed a first degree premeditated and intentional killing of the victim. See Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense":

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a).

We now will review the evidence of the shootings at the carwash and of Mr. Godwin's vehicle on Interstate 240.

## A. Shooting at the Carwash

The shooting at the carwash occurred on August 28, 2013, and resulted in the death of Robbie Webb and the convictions of all three Defendants of first degree premeditated murder. Although Lowell Love, who was wounded, did not see the shooters, others at the carwash did. Stanley Hibbler identified all three of the Defendants as being in the car circling the carwash and spraying bullets. Likewise, Cortaze Tisdel, who also was wounded in the shooting, identified all three of the Defendants as being responsible.

## B. Shooting on the Interstate

As to the second shooting, Randy Goodwin testified that as he was driving his vehicle on the interstate in Memphis, gunshots fired from a white Dodge Dart behind him shattered his back window. He said that Defendant Key was driving the car following him, as Defendants Otis and Gibbs were leaning out the windows. Edward Bryant testified that he and his girlfriend, Traci Lott, were passengers in Mr. Godwin's vehicle as a car following them began firing shots at them. Mr. Bryant said that, earlier in the day, he had seen Defendant Key driving the shooters' vehicle and identified Defendant

Gibbs as hanging out of that vehicle and shooting at Mr. Godwin's vehicle. From this evidence, we conclude that a reasonable jury could have determined that the Defendants were following Mr. Godwin's vehicle and firing multiple shots into it.

Although the Defendants argue on appeal that the State's witnesses were not credible, they base their argument on facts which came into evidence at the trial. Obviously, the jurors accredited the State's witnesses, as was their right. Accordingly, we conclude that the evidence presented by the State was sufficient to sustain the verdicts.

## II. Consolidation of Indictments

Prior to the trial, as well as on appeal, the Defendants assert that the trial court erred by consolidating the indictment regarding the shooting at the carwash with the indictment regarding the later shooting on the interstate. The State responds that the trial court correctly determined that the two shootings constituted a common scheme to kill the victims, asserting that the evidence of each shooting would be admissible at the trial of the other to show a "settled purpose to harm the same victim, and that the probative value of each shooting was not outweighed by the prejudicial effect of the evidence." We will consider these arguments.

Tennessee Rule of Criminal Procedure 8 sets out the circumstances under which offenses may be joined:

> (a) Mandatory Joinder of Offenses. -- Two or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s) and if they are within the jurisdiction of a single court. A defendant shall not be subject to separate trials for multiple offenses falling within this subsection unless they are severed pursuant to Rule 14.

> (b) Permissive Joinder of Offenses. -- Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character.

Rule 13(a) of the Tennessee Rules of Criminal Procedure sets out the circumstances under which a court may consolidate for trial separate indictments:

(a) Consolidation. The court may order consolidation for trial of two or more indictments, presentments, or informations if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8.

Rule 14(b) states, in part:

(1) If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

(2) If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(a), the court shall grant a severance of offenses in any of the following conditions:

(i) if before trial on motion of the State or the defendant it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense.

(ii) if during trial with consent of the defendant it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The court shall consider whether, in light of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

(iii) if the Court finds merit in both a motion by the district attorney general for a continuance based upon exigent circumstances that temporarily prevent the State from being ready for trial of the joined prosecutions and an objection by the defendant to the continuance based on a demand for speedy trial. If the Court grants a severance under this subdivision, it shall also grant a continuance of the prosecutions wherein the exigent circumstances exist.

Tenn. R. Crim. P. 14.

In Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000), the court described the type of hearing which must be held before there can be a consolidation of offenses:

A motion to consolidate or sever offenses is typically a pre-trial motion, see Tenn. R. Crim. P. 12(b)(5), and consequently, evidence and arguments tending to establish or negate the propriety of consolidation must be presented to the trial court in the hearing on the motion. Cf. Bruce v. State, 213 Tenn. 666, 670, 378 S.W.2d 758, 760 (1964) (stating that decisions to join offenses necessarily must be made prior to trial). . . . Further, because the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses.

12 S.W.3d at 445 (footnote omitted).

In State v. Garrett, 331 S.W.3d 392, 402 (Tenn. 2011), our supreme court explained what the State must establish before separate indictments are consolidated:

Where the State initially seeks to consolidate separate indictments, it must establish only one thing: that the offenses are either (1) "parts of a common scheme or plan," or (2) that the offenses are "of the same or similar character." Tenn. R. Crim. P. 8(b). See also Spicer, 12 S.W.3d at 443. If the defendant objects to the consolidation of offenses that would otherwise be permissible under Rule 8(b), however, the offenses may not be tried together unless *two* criteria are met: (1) "the offenses are parts of a common scheme or plan" and (2) "the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1) (emphasis added). See also [State v.] Denton, 149 S.W.3d [1,] 12-13 [(Tenn. 2004)].

Prior to the trial, the court presided at a hearing to determine whether the two indictments should be consolidated. No witnesses were called at the hearing. Rather, the parties relied upon the transcript of an earlier trial in the United States District Court in Memphis in which Mr. Randy Godwin, one of the victims in the state prosecution, had testified against Defendants Otis and Gibbs, presumably on the charges of felon in possession of a firearm. According to statements of various counsel, Mr. Godwin testified at the federal trial regarding the shootings at the carwash, as well as on the interstate. Further, Mr. Godwin admitted at trial that he and others present at the carwash had burglarized "Little D's" home, stealing money and narcotics and surmised that Defendants Otis and Gibbs, both associates of "Little D," were after him for that reason.

Following the hearing, the trial court explained that the State had made a sufficient showing that the charged offenses "constitute a common scheme or plan; evidence of each offense is relevant to some material issue in the trial of the other offenses; and that the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the [D]efendant." In its written findings, the court explained the basis for this conclusion:

The common scheme or plan was to kill the Witness Randy Godwin. This common scheme or plan requirement is satisfied by two of the three common scheme or plan types: offenses that are part of a larger, continuing plan or conspiracy, and offenses that are part of the same criminal transaction.

According to the Tennessee Supreme Court, a larger plan or conspiracy contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal. Here, it is clear that the Defendants had the same readily distinguishable goal for both offenses. Defendants opened fire on the Lamar Avenue car wash in order to kill the Victim, Robbie Webb, and the Witness, Randy Godwin, among others on August 28, 2013. Although the Defendants were unsuccessful in their attempt on the Witness, their attack was a criminal attempt on his life nonetheless. Their alleged reason for the shooting was retribution for the alleged, prior criminal acts by the Witness and Victim. Keeping this motive in mind, one could easily reach the conclusion that the Defendants were attempting to carry out the same retributive plan when they allegedly attempted to kill the Witness on September 21, 2013 near Bill Morris [Park]way. The September 18, 2013 encounter between the Defendants and the Witness, where Defendants allegedly threatened the Witness that if he disclosed his account of the August 28 offense they would kill him as well, does not shift or eliminate the larger plan or conspiracy. Although the defense contends that the September 18 encounter shows that the goal for the attempted highway murder was to silence the Witness and get away with the August 28 offense, one cannot conclude that the initial goal of retribution did not still remain. Additionally, the fact that the August 28, 2013 and September 21, 2013 incidents were separated by nearly four weeks has no effect on the preservation of the initial plan or conspiracy. The Tennessee Court of Criminal Appeals upheld a consolidation in State v. William Ramsey, [No. M2001-02735-CCA-R3-CD, 2003 WL 21658589, at *9 (Tenn. Crim. App. July 15, 2003), perm. app. denied (Tenn. Dec. 22, 2003)], where the relevant offenses were committed four months apart. Therefore, this Court

finds that the State has demonstrated a "working plan" whereby the subsequent offense on September 21, 2013 was predictable or probable from the [D]efendant[s'] initial offense on August 28, 2013.

We review this determination with an abuse of discretion standard. State v. Shirley, 6 S.W.2d 354, 362 (Tenn. 1999). As we have set out in the section reviewing the sufficiency of the evidence, it showed that, in retaliation for their burglary from the home of a gang member of money and marijuana, the Defendants were enlisted to kill one or more of the victims. Three witnesses identified the Defendants as shooting from a car circling the initial killing of a bystander at the carwash. At the subsequent shooting on the interstate, the same Defendants again fired upon and tried to kill one of the burglars who had survived the shooting at the carwash. Following the pretrial hearing in this matter, the court determined that tying together the two shootings was the Defendants' seeking revenge for the intended victims' burglary and theft from the home of another gang member; that, accordingly, evidence of each crime would be admissible at the trial of the other; and that the probative value of the interstate shooting outweighed any prejudicial effect. The record fully supports these determinations by the trial court.

### III. Sentencing

Defendants Otis and Gibbs argue on appeal that the trial court erred in sentencing them. Both assert that the trial court erred in ordering that their sentences be served consecutively, and Defendant Gibbs argues additionally that the trial court erred in sentencing him to the maximum sentence for each of his convictions. We will review these claims.

The trial court sentenced Defendant Gibbs to life for the first degree murder conviction and to twenty-five years for each conviction for attempted first degree murder. While the record on appeal includes a transcript of the sentencing of Defendant Otis, it does not contain one for the sentencing of Defendant Gibbs. Accordingly, as to Defendant Gibbs, the issue is waived. See Tenn. R. App. P. 24 (providing that it is the appellant's duty to prepare a fair, accurate, and complete record on appeal to enable this court to conduct a meaningful review).

As to Defendant Otis, the trial court made extensive findings, based upon the record, concluding that his state sentences should be served consecutively. At the sentencing hearing, the State recited Defendant Otis' criminal history, which included convictions in 2013 for criminal trespass, assault, evading arrest, resisting official detention, and possession of marijuana. Additionally, he had convictions in 2009 for facilitation of reckless endangerment and for aggravated assault.

At the conclusion of the sentencing hearing, the trial court summed up the reasons the sentences would be served consecutively:

I see nothing in his record that indicates he didn't do anything other than commit crimes. That's what he did.

But, anyway, looking at . . . well, I could . . . probably say that he is a professional criminal. That's what he does; he's a criminal. But even so -- even if you want to say that doesn't apply. I think that he is a dangerous offender based upon the facts of this case and this case alone, he is a dangerous offender whose behavior indicates little or no regard for human life. You just pull up there, and you unload on a carwash where there's people – there's a store – there's traffic going up and down the street behind . . . in the direction of these gunshots. And just from the facts of this case alone, under the extraordinary circumstances we had here, that, you know, based upon the circumstances around this offense and that the aggregate length of sentences would reasonably relate to the offense for which he stands convicted. In other words, it wouldn't make sense to run all of this concurrent based upon the facts of this case. He got life, which means fifty-one years, for the one victim he had. He has two other victims . . . that he was found guilty of attempted murder one. I just don't see the sense in running them concurrent. I mean, you get three for one. Hey, good for you. You know, this was an atrocious, violent act where other people could have been killed, and he showed very little concern, it seems, base[d] on the facts of this, for anyone else's safety.

So, I think, based upon what I've seen, his criminal record included . . . crimes of violence in the past, that he is a dangerous offender; and, so, therefore, I think twenty-five consecutive to twenty-five consecutive to life, so that would be life plus fifty years and show judgment executed.

A trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including that the defendant is an offender whose record of criminal activity is extensive or that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Id. § 40-35-115(b)(2), (4). When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed.

State v. Lane, 3 S.W.3d 456, 460–61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). We review the trial court's consecutive sentencing determinations for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. See State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013) (applying same deferential standard announced in State v. Bise, 380 S.W.3d 682 (Tenn. 2012)).

The criticism of Defendant Otis regarding the court's finding that he had an extensive prior history centers on the fact that his prior record consisted of one felony conviction and eight misdemeanors. Additionally, he argues that the trial court erred in finding him to be a dangerous offender. However, Tennessee Code Annotated section 40-35-115(b)(2) does not specify that only a defendant's felony record may be taken into account but instead denotes "criminal activity." In fact, this court has previously found that the imposition of consecutive sentences was justified when a defendant's record of criminal activity consisted only of misdemeanors. See, e.g., State v. Edwin Dewan Reese, No. M2011-01692-CCA-R3-CD, 2012 WL 12931585, at *3 (Tenn. Crim. App. May 14, 2012). Accordingly, we conclude that the trial court did not abuse its discretion in finding that the Defendant was a dangerous offender and had an extensive prior record of criminal activity. The trial court properly imposed consecutive sentencing.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE

- 13 -